IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROSALIND RUSS-TOBIAS              :              CIVIL ACTION
                                  :
       v.                         :
                                  :
PENNSYLVANIA BOARD OF             :              NO. 04-0270
PROBATION AND PAROLE,             :
EDWARD JONES, FRANK               :
MARGERUM, AND MICHAEL MOYER       :

O'NEILL, J.                                      MARCH 2, 2006

<u>MEMORANDUM</u>

        Plaintiff, Rosalind Russ-Tobias, filed an action against defendants, Pennsylvania Board of

Probation and Parole, Edward Jones, Frank Margerum, and Michael Moyer, on December 24,

2003 in the Philadelphia Court of Common Pleas claiming that defendants engaged in various

forms of race discrimination and retaliation that culminated in her termination from employment

at the Board in violation of the Pennsylvania Human Relations Act, 43 Pa. C.S. § 951, et seq.

(Count I), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

(Counts II & III), 42 U.S.C. § 1981 (Count IV), the First Amendment of the United States

Constitution (Count V), and the Equal Protection Act of the Pennsylvania Constitution, Pa.

Const., Art. 1, § 26 (Count VI).  Defendant removed the action to this Court on January 22, 2004.

Subject matter jurisdiction is proper under 28 U.S.C. § 1331.  Before me now is defendants'

motion for judgment as a matter of law or, in the alternative, motion for a new trial, or, in the

alternative, motion to alter or amend the judgment, plaintiff's response, defendants' reply, and

plaintiff's surreply thereto, as well as plaintiff's motion for attorneys' fees, defendants' response,

plaintiff's reply, and defendants' surreply thereto.

1

PROCEDURAL HISTORY

On November 16, 2004, my colleague Judge Dalzell granted in part and denied in part defendant's motion for summary judgment.  In his Order, Judge Dalzell dismissed plaintiff's discrimination claims under PHRA (Count I) and Title VII (Count II) against the individual defendants, Jones, Moyer, and Margerum, because individuals cannot be held liable under either Title VII or PHRA.  These claims continued against the Board only.  Judge Dalzell also granted summary judgment in favor of all defendants with respect to: (a) plaintiff's retaliation claims under Title VII (Count III) because plaintiff failed to exhaust her administrative remedies; (b) plaintiff's First Amendment claims (Count V) because plaintiff failed to show that her speech was a substantial or motivating factor in triggering the Board's actions; and (c) plaintiff's equal protection claims (Count VI) because defendants are protected by sovereign immunity.  Plaintiff's discrimination and retaliation claims under Section 1981 (Count IV) continued against all defendants.  Russ-Tobias v. Pa. Bd. of Probation and Parole, No. 04-0270, 2004 WL 2600109 (E.D. Pa. 2004).

In response to plaintiff's motion for reconsideration, on January 3, 2005, Judge Dalzell declined to reinstate Count I against the individual defendants or Counts III, V, & VI against all defendants.  In addition, Judge Dalzell permitted plaintiff to pursue her Section 1981 retaliation claim and held that "Courts in our Circuit permit § 1981 retaliation claims, see Cardena[s] v. Massey, 269 F.3d 251, 263 (3d Cir. 2001); White v. Gallagher Basset Serv., 257 F. Supp. 2d 804, 811 n.3 (E.D. Pa. 2003), and yet defendants never challenged plaintiff's retaliation theory in their summary judgment motion."  Judge Dalzell refused to allow defendants to challenge plaintiff's Section 1981 discrimination and retaliation claims as not viable under the Supreme Court's

2

holding in Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 731 (1989) because defendants did not

raise the issue until their motion for reconsideration.

Subsequently, the case was assigned to me.  Prior to trial, I issued an Order on April 27,

2005 in response to the parties' motions in limine that precluded plaintiff "from eliciting

evidence regarding [the pending cases of Zappan, Burton, and Watkins against the Board] or any

other pending, settled, or completed discrimination cases or proceedings against the Board and its

managers."  I also held that plaintiff was "precluded from eliciting testimony from these eleven

witnesses [Roadcloud, Miller, Rankin, Watkins, Williams, Zappan, Burton, Self, Scott, Holmes,

and Holman] regarding: (i) their respective employment disputes with the Board; (ii) their legal

conclusions with respect to their employment disputes; or (iii) their subjective perceptions or

opinions of the Board's operations and management or alleged discriminatory or retaliatory

motives."  In a separate order on April 27, 2005, I further prohibited plaintiff from expanding

"the scope of this action by presenting additional evidence, testimony, and arguments reflected in

her amended pretrial memorandum," including testimony by Kim Heath and Hugh Young,

evidence regarding settlements with Holman and Scott, and events relating to Heath's case

against the Board.

Plaintiff sought reconsideration of these Orders.  After oral argument, on May 2, 2005, I

granted plaintiff's motion for reconsideration with respect to Hugh Young because he "was

identified, although obliquely, and his deposition testimony was listed as an exhibit in plaintiff's

pretrial memorandum" and defendants would not be unfairly surprised by such evidence.  On

May 4, 2005, following oral argument, I held that "plaintiff will be permitted to offer these four

witnesses [Williams, Self, Rankin, Roadcloud] to testify as to the objective, factual

circumstances of their own respective experiences of discrimination by defendants to support the inference that defendants were motivated by a discriminatory animus."  However, I held that "[t]hese witnesses will not be permitted to testify as to: (1) their subjective perceptions or opinions of defendants' motives and intent behind their alleged discriminatory actions; (2) their legal conclusions with respect to their employment disputes with defendants; or (3) any civil actions, settled or otherwise, that they or other employees may have filed against defendants."  I further held that "[p]laintiff will be permitted to offer the testimony of William Miller and Ronald Zappan only for the limited purpose of testifying to the discriminatory statements allegedly made by defendants reflecting their discriminatory animus toward African American employees."  Finally, I held that "[p]laintiff will be precluded from offering the testimony of Holman and Holmes subject to offers of proof that demonstrate: (1) that their testimony is sufficiently relevant to plaintiff's case; and (2) that their testimony is not cumulative, or that they will testify only as to 'smoking gun' statements allegedly made by defendants reflecting their discriminatory animus towards African American employees."[1]

Trial began with voir dire and opening statements on May 4, 2005 and concluded with closing arguments on May 19, 2005.  At the close of plaintiff's case in chief on May 13, 2005, defendants raised for the first time before me their argument that plaintiff's Section 1981 discrimination and retaliation claims are not viable as a matter of law because, under the Supreme Court's holding in Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 731 (1989), and its progeny, Section 1981 does not by itself provide a cause of action.  Defendants requested that I

---

[1]I must observe that had counsel presented in his written submission that resulted in the Order of April 27 the arguments he subsequently made orally his motion for reconsideration probably would not have been necessary.

enter judgment in favor of defendants with respect to plaintiff's Section 1981 claims, dismiss

plaintiff's claims against the individual defendants, and charge the jury solely on plaintiff's

discrimination claims against the Board.  Defendants subsequently filed a brief to this effect.

Notwithstanding this argument, I stated on May 16, 2005 that "with the law undecided in the

Circuit, the only prudent thing [for] me to do is to send the 1981 claim to the jury, then sort it out

afterwards" in any post trial motions.  On May 19, 2005, I charged the jury to consider plaintiff's

claims of disparate treatment discrimination and retaliation against all defendants, the Board,

Jones, Margerum, and Moyer.  On May 23, 2005, the jury returned, and I entered, a verdict in

favor of plaintiff and against the Board, Jones, and Moyer, but in favor of Margerum and against

plaintiff, with respect to both her discrimination and retaliation claims.  Per my instructions, the

jury awarded plaintiff compensatory, back pay, and front pay damages for her claims against the

Board and compensatory, back pay, front pay, and punitive damages against Jones and Moyer.

Unfortunately, on the verdict sheet I did not instruct the jury to separate the damages attributable

to her discrimination claim from those attributable to her retaliation claim nor was I asked to do

so.  Thereafter, renewing their arguments with respect to Section 1981, defendants filed a timely

motion for judgment as a matter of law or, in the alternative, motion for a new trial.

STANDARD OF REVIEW

I.      Judgment as a Matter of Law

        Federal Rule of Civil Procedure 50(a) provides that a court may determine an issue

against a party as a matter of law "[i]f during a trial by jury a party has been fully heard on an

issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party

on that issue."  Fed. R. Civ. P. 50(a) (2006).  Rule 50(b) further provides:

5

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment--and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may . . . (A) allow the judgment to stand, (B) order a new trial, or (C) direct entry of judgment as a matter of law.

See also Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 149-51 (2000).  "[J]udgment as a matter of law should be granted sparingly." Johnson v. Campbell, 332 F.3d 199, 204 (3d Cir. 2003).

"A motion for judgment as a matter of law under Federal Rule 50(a) should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." Marinelli v. City of Erie, 216 F.3d 354, 359 (3d Cir. 2000) quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (internal quotations omitted); Macleary v. Hines, 817 F.2d 1081, 1083 (3d Cir. 1987).  In other words, "[s]uch a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).  "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability.  The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." Id. (internal quotations and citations omitted).

In reviewing a motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves, 530 U.S. at 150. "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (internal quotations omitted).

II.     New Trial

Alternatively, Federal Rule of Civil Procedure 59(a) provides, in relevant part:

> A new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

Fed. R. Civ. P. 59(a) (2006). Rule 59(a) does not set forth specific grounds on which a court may grant a new trial. "The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court." Blancha v. Raymark Indus., 972 F.2d 507, 512 (3d Cir. 1992) citing Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980).

The scope of a district court's discretion in evaluating a motion for a new trial depends on whether the motion is based upon a prejudicial error of law or a verdict alleged to be against the weight of the evidence. See Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993). When the motion involves a matter within the sound discretion of the trial court--such as the court's evidentiary rulings, points of charge to the jury, or a prejudicial statement made by counsel--the district court has wide latitude in ruling on the motion. Id. By contrast, when the verdict is

alleged to be against the weight of the evidence, a district court's discretion is more limited.  Id.

at 1290.  "[N]ew trials because the verdict is against the weight of the evidence are proper only

when the record shows that the jury's verdict resulted in a miscarriage of justice or where the

verdict, on the record, cries out to be overturned or shocks our conscience."  Williamson v.

Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991).  Moreover, the type of case at hand also

factors into the scope of the court's discretion: "Where the subject matter of the litigation is

simple and within a layman's understanding, the district court is given less freedom to scrutinize

the jury's verdict than in a case that deals with complex factual determinations."  Id. at 1352.

DISCUSSION

I.      Defendants' Motion for Judgment as a Matter of Law

A.      Plaintiff's Section 1981 Discrimination and Retaliation Claims Against All Defendants

Defendants primarily argue that Russ-Tobias' Section 1981 retaliation and discrimination

claims should be dismissed as a matter of law because Section 1981 does not create a private

right of action for violation of an individual's rights to make and enforce contracts.  I agree.  My

colleague, Judge Kauffman, has recently opined on the same issue involving another former

employee, also represented by plaintiff's counsel in this case, against the Board and its

management.  See Roadcloud v. Pa. Bd. of Probation & Parole, No. 05-3787, 2006 WL 83453

(E.D. Pa. Jan. 6, 2006).  Judge Kauffman addresses the present parties' substantive arguments

with respect to a Section 1981 claim in that opinion.  I agree with Judge Kauffman's analysis

and, rather than repeating it here, direct the parties to his memorandum and Order.  Judge

Kauffman's holding that no independent cause of action exists under Section 1981 is supported

by the majority of the cases in this District, see, e.g., Foxworth v. Pa. State Police, No. 03-6795,

8

2005 WL 840374 (E.D. Pa. Apr. 11, 2005); Carlton v. City of Phila., No. 03-1620, 2004 WL

633279 (E.D. Pa. Mar. 20, 2004); Miles v. City of Phila., No. 98-5837, 1999 WL 274979 (E.D.

Pa. May 5, 1999); Poli v. SEPTA, No. 97-6766, 1998 WL 405052 (E.D. Pa. Jul. 7, 1998), and

this view seemingly is supported by the Court of Appeals, see Oaks v. City of Phila., 59 Fed.

Appx. 502 (3d Cir. 2003).   Contra Watkins v. Pa. Bd. of Probation & Parole, No. 02-2881, 2002

WL 32182088 (E.D. Pa. Nov. 25, 2002).

Unlike plaintiff in Roadcloud, however, Russ-Tobias has not asserted a Section 1983

retaliation or discrimination claim into which her Section 1981 retaliation and discrimination

claims could be merged.  Although Russ-Tobias asserted a First Amendment claim in Count V of

her complaint she did not assert Section 1983 at all in her complaint.  Judge Dalzell presumed

the assertion of Section 1983 in connection with her First Amendment claim but granted

summary judgment in favor of defendants on Count V because Russ-Tobias failed to show that

her speech was a substantial or motivating factor in triggering the Board's actions.  Furthermore,

any Section 1983 claim asserted by Russ-Tobias would not be viable against the Board, as it is a

municipal entity.  See Will v. Mich. Dep't of State Police, 491 U.S. 58 (1989).  Absent any

continuing viable Section 1983 retaliation and discrimination claims, Russ-Tobias' Section 1981

retaliation and discrimination claims against the individual defendants cannot be salvaged via

merger as in Roadcloud.  Moreover, now that we have reached the post trial stage of litigation, I

decline to rewrite Russ-Tobias' complaint to include a Section 1983 retaliation or discrimination

claim.  Therefore, because Russ-Tobias failed to assert a Section 1983 claim for allegedly

violating her rights under Section 1981 she is precluded from litigating her Section 1981

retaliation and discrimination claims.

Judge Dalzell's decision not to consider defendants' Section 1981 arguments in their response to plaintiff's motion for reconsideration and my decision not to evaluate the merits of that argument following plaintiff's case in chief did not determine that issue finally in favor of Russ-Tobias; those decisions have not become the law of the case. Russ-Tobias' argument to the contrary is disingenuous. "The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it." Lambert v. Blackwell, 387 F.3d 210, 237 n. 20 (3d Cir. 2004) quoting Fagan v. City of Vineland, 22 F.3d 1283, 1290 (3d Cir. 1994) (internal quotations omitted). However, "while the law of the case doctrine bars courts from reconsidering matters actually decided, it does not prohibit courts from revisiting matters that are avowedly preliminary or tentative." St. Thomas-St. John Hotel & Tourism Ass'n Inc. v. United States, 357 F.3d 297, 301 (3d Cir. 2004) quoting Council of Alternative Political Parties v. Hooks, 179 F.3d 64, 69 (3d Cir.1999) (internal quotations omitted). Moreover, "[d]icta statements are not binding law of the case. Similarly, courts may refuse to infer decisions on issues that were barely presented, or from summary decisions." Ogbudimkpa v. Ashcroft, 342 F.3d 207, 210 n. 6 (3d Cir. 2003) (superceded by statute on other grounds). Such is the case here. With respect to defendants' motion for judgment as a matter of law on Russ-Tobias' Section 1981 retaliation and discrimination claims asserted following plaintiff's case in chief, I stated, in relevant part:

> The Circuits are split and Judge Weiner has written an opinion contrary to Judge Baylson's opinion. So, with the law undecided in this Circuit, the only prudent thing [for] me to do is to send a 1981 claim to the jury, then sort it our afterwards if the Court of Appeals decides the law.
> *       *       *
> I'm not going to follow the law at this point that says there cannot be any 1981 action. If [defendants] have an argument on your motion at the conclusion of the case that there's

insufficient evidence to go to the jury, of course, you'll be free to argue that. . . .  I've denied your motion, but entirely without prejudice to its renewal . . . at the end of all the evidence and also post verdict.

\*         \*         \*

So, you're not in any way prejudiced by -- in other words, it's an open field on those arguments.

These statements clearly preserved the issue for post trial proceedings.  Similarly, defense counsel's statements in her renewed motion for judgment as a matter of law--that "I want to reassert the argument I already made about Section 1981 as a technical matter[, b]ut I understand that that's not open for discussion anymore"--is not an acknowledgment by defense counsel that the viability of Russ-Tobias' Section 1981 retaliation and discrimination claims has become the law of the case.  Plaintiff's counsel's arguments to the contrary border on frivolity.

Even if the viability of Russ-Tobias' Section 1981 retaliation and discrimination claims had become the law of the case, I would exercise my discretion to revisit such a determination because absent an assertion of a Section 1983 claim in which to merge her Section 1981 retaliation and discrimination claims Russ-Tobias' Section 1981 retaliation and discrimination claims are not supported by law.  See Lambert v. Blackwell, 387 F.3d 210, 237 n. 20 (3d Cir. 2004) ("A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.  In other words, the law of the case doctrine does not limit a federal court's power, rather it directs its exercise of discretion.") quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988) and Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 116 (3d Cir. 1997) (internal quotations omitted).

11

Russ-Tobias' Section 1981 retaliation and discrimination claims should not have gone to trial. I will therefore grant defendants' motion for judgment as a matter of law with respect to Russ-Tobias' Section 1981 retaliation and discrimination claims and judgment will be entered in favor of all defendants on these claims. Obviously, if Russ-Tobias's Section 1981 claims are not supported by the law, I need not discuss whether there is a legally sufficient evidentiary basis for a reasonable jury to find liability on that claim. See Fed. R. Civ. P. 50(a). Nevertheless, I will discuss the evidence with respect to plaintiff's Title VII and PHRA discrimination claims under the insufficient evidence standard for judgment as a matter of law, Rule 50(a), and the evidence with respect to plaintiff's Section 1981 retaliation claim under the weight of the evidence standard for new trials, Rule 50(c)(1).

The net effect of my holding with respect to Section 1981 is to remove plaintiff's claims of discrimination and retaliation against the individual defendants, Jones and Moyer, and plaintiff's claims of retaliation against the Board. The only claims that continue are Russ-Tobias' claims of discrimination against the Board under Title VII and PHRA.

B.      Plaintiff's Section 1981, Title VII, and PHRA Discrimination and Retaliation Claims

        Against Moyer

Defendants also argue that Moyer is entitled to judgment as a matter of law because there is no evidence that Moyer did anything other than conduct an OPR investigation under instructions from the Board. I agree. Moyer answers only to OPR Director Paul Read and has no role in the decision to impose discipline on any employee. Moyer's performance of his purely investigatory job assignment ended on April 8, 2002, with the submission of his report to Read. Moyer did not did not take any adverse action against Russ-Tobias. Russ-Tobias continued her

employment with the Board until June 7, 2002, well after Moyer (and Margerum) concluded the OPR investigation.  There is no evidentiary basis on which a reasonable jury could find that Moyer took an adverse action against Russ-Tobias.  These grounds provide a separate basis on which to grant judgment as a matter of law in favor of Moyer.

Having determined that judgment as a matter of law is appropriate on plaintiff's Section 1981 retaliation and discrimination claims against all defendants and all of plaintiff's claims against Moyer, I am required by Federal Rule of Civil Procedure 50(c)(1) to determine whether there are grounds that support a motion for a new trial on these claims, should my judgment as a matter of law be vacated or reversed by the Court of Appeals.  As will be discussed with respect to defendants' motion for a new trial, below, should the Court of Appeals reverse or vacate my conclusion with respect to Section 1981, I would not grant a new trial for the Board and Jones because there is sufficient evidence to go to the jury regarding their liability for race discrimination and retaliation.  However, should the Court of Appeals reverse or vacate my judgment as a matter of law with respect to Moyer, I would grant Moyer a new trial because there is no evidentiary basis on which a reasonable jury could find that Moyer took an adverse action against Russ-Tobias.

C.      Plaintiff's Title VII and PHRA Discrimination Claims Against the Board

Beyond their Section 1981 arguments, defendants also argue that I should grant judgment as a matter of law in their favor with respect to Russ-Tobias' Title VII and PHRA discrimination claims because, after discounting for my allowance of certain allegedly inadmissible testimony, there is insufficient evidence for a reasonable jury to reach a verdict in favor of plaintiff on her Title VII and PHRA discrimination claims.  Defendants do not assert that my allowance of such

testimony by itself is cause for judgment as a matter of law.  As discussed with respect to

defendant's motion for a new trial, however, defendants assert that my allowance of such

testimony is cause for a new trial.

For purposes of its motion for judgment as a matter of law, defendants appear to argue

that I should disregard the testimony of Zappan, Young, Williams, Self, and Holman as being

irrelevant and prejudicial.  Defendants also argue that I should disregard plaintiff's counsel's line

of questioning of Costa, Hodge, Starling, Taylor, Scicchitano, Robinson, Marshall, Ingram,

Tuttle, and Newton with respect to their knowledge of complaints made to the Board regarding

racially discriminatory treatment as being not probative and unfairly prejudicial.

Even stripping the evidence down to exclude the testimony to which defendants object,

there still remains sufficient evidence, viewed in the light most favorable to plaintiff, upon which

a reasonable jury could return a verdict in favor of plaintiff.  See Fed. R. Civ. P. 50(a) (2006);

Lightning Lube, 4 F.3d at 1166 (holding that a motion for judgment as a matter of law "should be

granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it

the advantage of every fair and reasonable inference, there is insufficient evidence from which a

jury reasonably could find liability.").

I will review the remaining evidence within the framework of the law with respect to

claims of race discrimination.  It is an unlawful employment practice for an employer "to fail or

refuse to hire or to discharge any individual, or otherwise to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1)

(2006).  To prevail on a claim of race discrimination on a theory of disparate treatment, plaintiff

must demonstrate purposeful discrimination.  Patterson v. McLean Credit Union, 491 U.S. 164

(1989) (superceded by statute on other grounds).  Absent direct evidence of discrimination,

plaintiff may prove intent via the familiar tripartite analysis applicable to employment

discrimination actions.[2]  See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) citing

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

1. Prima Facie Case for Discrimination

　　　First, the plaintiff must establish a prima facie case of discrimination.  Jones, 198 F.3d at

413.  Plaintiff can establish her prima facie case by showing the following: (1) that she is a

member of a protected class; (2) that she is qualified for the position; (3) that she suffered an

adverse employment action; (4) that the circumstances of the adverse employment action give

rise to an inference of unlawful discrimination such as might occur when the position is filled by

a person not of the protected class.  Id. at 410.  With respect to the adverse employment action

prong, the Court of Appeals has held that "something less than a discharge could be an adverse

employment action" and that "employment decisions such as transfers and demotions may

suffice to establish the third element of a plaintiff's prima facie case."  Id. at 411-12.  The Board

does not contend that there is insufficient evidence to support Russ-Tobias' prima facie case.

2.　　　Legitimate Nondiscriminatory Reason

　　　"If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the

defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment

action."  Id. at 410 quoting McDonnell Douglas, 411 U.S. at 802 (internal quotations omitted);

---

[2]Liability for race discrimination under Title VII and PHRA are analyzed under the same
legal standard.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999).

<u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997).  While the burden of production may shift under the <u>McDonnell Douglas</u> paradigm, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  <u>Jones</u>, 198 F.3d at 410 <u>quoting</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981) (internal quotations omitted).  It is not disputed that defendants asserted that Russ-Tobias was terminated because of her poor work performance and failure to follow Board policies, as detailed in the OPR report.

3.      Pretext

"Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  <u>Jones</u>, 198 F.3d at 410.  "At trial, the plaintiff must convince the finder of fact both that the reason was false, and that discrimination was the real reason."  <u>Id.</u> at 412-13 <u>quoting</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993) (internal quotations omitted).  "The fact finder's rejection of the employer's proffered reason allows, but does not compel, judgment for the plaintiff."  <u>Jones</u>, 198 F.3d at 413.

"[T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."  <u>Reeves</u>, 530 U.S. at 148.  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . .

includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that

the employer's explanation is false, and any other evidence that supports the employer's case and

that properly may be considered on a motion for judgment as a matter of law."  Id.

A plaintiff may show pretext by pointing "to some evidence, direct or circumstantial,

from which a reasonable fact finder would either: (1) disbelieve the employer's articulated

legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than

not a motivating or determinative cause of the employer's action."  Jones, 198 F.3d at 413

quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (internal quotations omitted).

However,

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken,
> since the factual dispute at issue is whether discriminatory animus motivated the
> employer, not whether the employer is wise, shrewd, prudent or competent.  Rather, the
> nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies,
> incoherencies, or contradictions in the employer's proffered legitimate reasons for its
> actions that a reasonable factfinder could rationally find them unworthy of credence.

Jones, 198 F.3d at 413 quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir.

1997) (internal quotations omitted).

"[P]laintiff may satisfy this standard by demonstrating, through admissible evidence, that

the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it

cannot have been the employer's real reason."  Id. quoting Keller, 130 F.3d at 1109 (internal

quotations omitted).  Plaintiff also may satisfy this standard "by pointing to evidence in the

record which allows the fact finder to infer that discrimination was more likely than not a

motivating or determinative cause of the adverse employment action."  Jones, 198 F.3d at 413

quoting Fuentes, 32 F.3d at 764 (internal quotations omitted).  For example, "the plaintiff may

show that the employer has previously discriminated against the plaintiff, that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Jones, 198 F.3d at 413 quoting Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998) (internal quotations omitted); Fuentes, 32 F.3d at 765.

Defendants argue that there is insufficient evidence to support the jury's required dual determinations with respect to the pretext analysis: (i) that defendants' asserted justification for Russ-Tobias' termination was false; and (ii) that Russ-Tobias' asserted discriminatory reason was more likely than not a motivating or determinative cause behind her termination.  With respect to the first determination, defendants appear to assert that its stated reason for terminating Russ-Tobias was "reasonable" because she violated the Code of Conduct in several ways, as discovered by and reported in the OPR investigation conducted by Moyer and Margerum. Defendants argue that management officials are entitled to rely upon information contained in an investigation conducted by others; see McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 11-28-29 (10th Cir. 1998); Hawkins v. Ceco Corp., 883 F.2d 977, 980 n.2 (11th Cir. 1989); and that the jury first had to determine that defendants' reliance on the OPR report was unreasonable, see Waters v. Churchill, 511 U.S. 661, 678 (1994); Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 855 (8th Cir. 2005); Pope v. ESA Servs., Inc., 406 F.3d 1001, 1008 (8th Cir. 2005); Barnes v. United Parcel Service, 366 F. Supp. 2d 612, 615 (W.D. Tenn. 2005).  "[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision.  Management does not have to make proper decisions, only non-discriminatory ones."  Bryant v. Compass Group USA, Inc., 413 F.3d 471, 478 (5th Cir.

18

2005).  Defendants argue that Russ-Tobias failed to establish that defendants' reliance on the OPR report was unreasonable.  I disagree.  The jury was entitled to reject defendants' explanation for Russ-Tobias' termination and reasonably could have determined that defendants' reliance on the OPR report was not the real reason for her termination.  The jury could have believed Russ-Tobias testimony: (a) that, because she was African American, defendants intentionally transferred her into a challenging position where she would fail and, thus, defendants could terminate her without raising the issue of race discrimination; and (b) that the OPR investigation was initiated in retaliation for her refusal to be transferred into that new position (i.e. refusing to be put in a position where she would fail) and as a means of building a case against her to support a termination that would appear not to be motivated by race discrimination.

With respect to the jury's second determination, defendants appear to assert that there is insufficient evidence for a rational jury to determine that Russ-Tobias' termination was racially motivated.  Defendants argue that the probative value of Russ-Tobias' proof that defendants' explanation is false is weak and the evidence negates any possible finding that defendants discriminated against her on the basis of race.  Defendants contend that Russ-Tobias' theory of her case against defendants focused on the reasonableness of its reliance on the OPR investigation and on the wisdom of its business judgment rather than on evidence of Russ-Tobias' job performance.  Rather than review the entire evidence, defendants argue that this view is supported by two examples.  First, defendants argue that plaintiff's counsel focused his direct examination of Umberger on the notion that one should not rely upon the statements of DRC offenders.  Defendants argue that plaintiff's theory fails to account for the fact that the DRC offenders and Russ-Tobias are the only (or the principal) sources of information as to whether

19

plaintiff met with her parolees.  Defendants also argue that every offender interviewed by Moyer

and Margerum reported that Russ-Tobias did not have regular contact with the parolees.  Second,

defendants argue that although plaintiff's counsel was allowed to use a portion of the Auditor

General's report to argue that her job performance was no better than anyone else at the Board

the Auditor General's report did not have significant probative value.  Defendants assert:

> Even if it had wanted to, the Board could not have taken the Auditor General's findings
> into account in deciding whether the charges against plaintiff merited termination or not,
> because the report was not issued until April 2003, almost a year after the termination
> decision.  More important [sic], the Auditor General's conclusions were based on a
> minuscule sample of files; their interpretation of the Board's supervision requirements
> differed from the Board's own interpretation of its requirements; and the report criticized
> all agents, regardless of race (thereby lending no support to plaintiff's allegation that she
> was singled out for unwarranted discipline because of her race).

Although certain pieces of evidence could be interpreted in favor of defendants and may not by

themselves support a finding of race discrimination, the jury was entitled to interpret those pieces

of evidence in favor of Russ-Tobias and reasonably could rely on multiple other pieces of

evidence, including Russ-Tobias' testimony, to determine that defendants were motivated by race

in terminating Russ-Tobias.  Moreover, the fact that the Auditor General's report was not issued

until after the termination decision does not obviate the jury's possible determination that the

facts which gave rise to the Auditor General's findings were common knowledge at the Board

and that the Auditor General's report was merely an official statement of an already well known

problem.

With respect to such other pieces of evidence, defendants contend that Russ-Tobias did

not offer any evidence to refute the charges asserted against her in the OPR report.  Defendants

argue that "she has <u>not</u> offered any concrete proof that she <u>did</u> see her offenders regularly, that

she <u>did</u> complete reports thoroughly and accurately, that she <u>did</u> comply with all Board vehicle policies, etc."  Defendants acknowledge that "[i]t is not mandatory for plaintiff to make such a showing, [] it would have been 'powerful evidence' of pretext."  <u>Cf.</u> <u>Hill v. City of Scranton</u>, 411 F.3d 118, 130 (3d Cir. 2005).  Defendants continue to argue that Russ-Tobias could not offer evidence that she complied with the Board's code of conduct and other employment policies and that she admitted to the following: (i) misusing her state vehicle to transport her children; (ii) failing to see offenders face to face within five days after they are released from prison; (iii) failing to file her paperwork promptly; (iv) completing ISRs without first seeing the offenders; (v) failing to go to the DRC at night at all even though some of her offenders were unable to meet during the day as a result of jobs, classes, and other obligations; (vi) holding driver's licenses from two different states; and (vii) having completed all required training classes, access to Board handbooks and manuals, and served as a parole agent for six years.  However, Russ-Tobias offered evidence, including the Auditor General's report, that these sorts of violations were rampant among employees at the Board.  Although that report was not released until after Russ-Tobias was terminated, the jury could have interpreted the report to reflect a culture of poor performance that was well known at the Board at the time of her termination.  Therefore, the jury reasonably could have believed that Russ-Tobias was terminated for some reason other than her poor work performance.  Viewing this evidence in conjunction with Russ-Tobias' testimony and related evidence that a white woman, Roth, was not terminated despite having similarly failed to live up to the Board's employment standards, the jury reasonably could have believed that Russ-Tobias was terminated on the basis of race.

With respect to such black-white comparisons, defendants take issue with Russ-Tobias'

choice of Roth as a comparator.  The Court of Appeals has held that "just as an employer cannot

insulate itself from claims of racial discrimination by identifying a token black person whom it

treated with abnormal leniency, a black plaintiff cannot establish racial discrimination by

singling out one white person who was treated more favorably when there were other white

persons who were treated less favorably than other black persons."  Simpson, 142 F.3d at 646 (3d

Cir. 1998).  "Such a pattern, in which blacks sometimes do better than whites and sometimes do

worse, being random with respect to race, is not evidence of racial discrimination."  Id.  "[T]o

hold otherwise would be to permit the inference of discrimination anytime a single member of a

non-protected group was allegedly treated more favorably than one member of the protected

group, regardless of how many other members of the non-protected group were treated equally or

less favorably."  Id.  Defendants argue that Roth is not an appropriate comparator for Russ-

Tobias because, in contrast to Roth who "frequently and explicitly told her supervisor that she

could not handle all her work, and her supervisor knew it would be physically impossible for

anyone at that time," Russ-Tobias "never suggested to Ms. Ferguson that she was struggling, and

Ms. Ferguson was under the impression that everything was fine."

However, at trial, defendants also drew imperfect comparisons between Russ-Tobias and

other white employees of the Board who were treated equally or less favorably than Russ-Tobias

with respect to their poor work performance.  For example, defendants assert that the testimony

of Marshall, Marcinko, Margerum, Moyer, and Reed demonstrates that, in recent years, the

Board has investigated and terminated four white male parole agents for the same type of

behavior that led to Russ-Tobias' termination.  In its rejoinder to Russ-Tobias' counterargument-

22

-that the those terminated agents worked in different districts which are not under the control of Jones--defendants argue that such evidence demonstrates that Board termination decisions are made in the Central Office, not locally, and that such investigations and resulting discipline are consistent across the Commonwealth.

Defendants also direct my attention to evidence of other African American employees at the Board who received favorable treatment there: (1) Thomas, the former Eastern Regional Director, under whom Jones served for a time; (2) Marshall, the retired Labor Relations Coordinator who was the first to recommend Russ-Tobias' termination; (3) Starling, the Acting Deputy District Director, who believed there were deficiencies in Russ-Tobias' work; (4) Nealy, the retired Deputy District Director who concluded that some discipline was warranted against Russ-Tobias; (5) Ferguson, who concurred that Russ-Tobias had problems with her work; (6) Hodge, who seemed to work well with Jones; and (7) Miller, who acknowledged that Jones had signed off on a commendable evaluation he received and that Jones had recommended to Thomas that Miller not receive discipline.  At this stage of litigation, I am disinclined to second guess the jury's comparisons of Russ-Tobias with Roth, Russ-Tobias with the terminated four white parole agents, and/or Russ-Tobias with the circumstances of other black employees at the Board, including Thomas, Marshall, Starling, Nealy, Ferguson, Hodge, and Miller.

Notwithstanding these arguments, defendants state that "for purposes of their motion for judgment as a matter of law only, defendants will assume that there is evidence in the record that would allow the jury to reject defendants' contentions and draw plaintiff's suggested interference about the reason for the termination action."  Defendants appear to concede that there is sufficient evidence to support a reasonable jury verdict in favor of Russ-Tobias' but continue to

marshal their most favorable evidence to argue that the jury should have reached a verdict in their favor, notwithstanding the standard of review of judgments as a matter of law. Defendants fail to account for any of the evidence that supports Russ-Tobias' case, including Russ-Tobias' own testimony. Despite its valiant effort to reargue the merits of its case with its favorable facts, I am not tempted by defendants' veiled attempt to have me weigh the evidence in its favor. See Reeves, 530 U.S. at 150 ("the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."). Defendants do not and cannot argue that the jury's verdict was based on a mere scintilla of evidence. See id. ("Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.") (internal quotations and citations omitted). There was sufficient evidence presented in this case for a reasonable jury to render a verdict in favor Russ-Tobias. I will therefore deny defendants' motion for judgment as a matter of law with respect to plaintiff's claims of discrimination under Title VII and PHRA.

## II.      Defendants' Motion for a New Trial

### A.      Section 1981 Issues

My conclusion with respect to Russ-Tobias' Section 1981 retaliation and discrimination claims renders my instructions to the jury erroneous. See Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993); Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991). As discussed above, the jury awarded plaintiff compensatory, back pay, and front pay damages for her claims against defendants but I did not instruct the jury to distinguish between the

damages attributable to her Title VII and PHRA discrimination claims and those attributable to her Section 1981 retaliation claim.  Having determined that it was improper to have allowed Russ-Tobias' Section 1981 retaliation claim to go to trial and to have instructed the jury to consider that claim against defendants, I am unable to discern which portion of the judgment award is attributable to Russ-Tobias' Title VII discrimination claims and which is attributable to her Section 1981 retaliation claim.  I will therefore exercise my discretion to order a new trial on plaintiff's Title VII and PHRA discrimination claims.  See Klein, 992 F.2d at 1289-90.

Russ-Tobias asks me to assume that the jury's verdict constitutes an award for her Title VII and PHRA discrimination claims alone because her discrimination claims incorporate certain acts of retaliation and were interrelated with her former Section 1981 retaliation claim. However, the jury rendered a judgment award based upon a finding of liability on two general claims, discrimination and retaliation.  The jury may have awarded a larger sum of money for a finding of liability on both discrimination and retaliation than it would have awarded for a finding of liability of only discrimination.  It is impossible to know at this stage whether the jury would have awarded the same sum of money solely on the basis of Russ-Tobias' Title VII and PHRA discrimination claims.  I decline to make such an assumption; to do so would result in prejudicial error that is inconsistent with substantial justice.  See Farra v. Stanley-Bostitch, Inc., 838 F. Supp. 1021, 1026 (E.D. Pa. 1993); Fed. R. Civ. P. 61 (2006).

In the alternative, Russ-Tobias asks that I order a partial new trial with respect to damages.  However, a partial new trial:

> may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice. Consistent with these principles, a new trial limited solely to damages is improper where

> the question of damages is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial.

Pryer v. C.O. 3 Slavic, 251 F.3d 448, 454-55 (3d Cir. 2001) quoting Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931) (internal quotations omitted).  That is, "the grant of a partial new trial is appropriate only in those cases where it is plain that the error which has crept into one element of the verdict did not in any way affect the determination of any other issue."  Pryer, 251 F.3d at 454-55 quoting Elcock v. Kmart Corp., 233 F.3d 734, 758 (3d Cir. 2000) (internal quotations omitted).  Here, the jury's judgment award with respect to Russ-Tobias' Title VII and PHRA discrimination claims was inextricably intertwined with the jury's findings of retaliation.  Because plaintiff's Title VII and PHRA discrimination claims and Section 1981 retaliation claim share similar elements of proof, it is impossible to instruct a new jury to render damages exclusively for discrimination where the first jury has found liability for retaliation based upon those same elements.  I therefore decline to order a partial new trial.

Having granted defendants' motion for judgment as a matter of law with respect to plaintiff's Section 1981 retaliation and discrimination claims, I am required by Federal Rule of Civil Procedure 50(c)(1) to rule on defendants' motion for a new trial with respect to those claims.  Fed. R. Civ. P. 50(c)(1) (2006) ("If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial.").  Defendants argue that I should grant its motion for a new trial on all of plaintiff's claims (her Section 1981 retaliation & discrimination as well as her Title VII & PHRA discrimination claims) for two reasons: (a) because I erred as a

matter of law by allowing plaintiff to introduce certain testimony that was prejudicial to defendants' defense; and (b) because the verdict is against the weight of the evidence.  Should my grant of judgment as a matter of law with respect to plaintiff's Section 1981 retaliation and discrimination claims be vacated or reversed I would not grant a new trial for those claims to the Board and Jones.  Moreover, I would not grant a new trial to the Board and Jones for plaintiff's Title VII and PHRA discrimination claims.[3]  However, as discussed below, I will allow the OPR report to go into the jury room at the new trial.

B.      Evidentiary Errors

As discussed above, the scope of a district court's discretion in evaluating a motion for a new trial depends on whether the motion is based upon a prejudicial error of law or a verdict alleged to be against the weight of the evidence.  See Klein, 992 F.2d at 1289-90.  When the motion involves a matter within the sound discretion of the trial court--such as the court's evidentiary rulings, points of charge to the jury, or a prejudicial statement made by counsel--the district court has wide latitude in ruling on the motion.  Id.

1.      "Other Employee" Evidence

Defendants first attack my rulings with respect to testimony from other Board employees.  As discussed above, I issued an Order that precluded plaintiff: (1) from eliciting evidence regarding the pending cases of Zappan, Burton, and Watkins against defendants or any other pending, settled, or completed discrimination cases or proceedings against defendants and its

---

[3]As discussed above, should the Court of Appeals reverse or vacate my judgment as a matter of law with respect to Moyer, I would grant Moyer a new trial because there is no evidentiary basis on which a reasonable jury could find that Moyer took an adverse action against Russ-Tobias.

managers; (2) from eliciting testimony from Roadcloud, Miller, Rankin, Watkins, Williams, Zappan, Burton, Self, Scott, Holmes, and Holman regarding (a) their respective employment disputes with the Board, (b) their legal conclusions with respect to their employment disputes, or (c) their subjective perceptions or opinions of the Board's operations and management or alleged discriminatory or retaliatory motives; (3) from expanding the scope of this action by presenting additional evidence, testimony, and arguments reflected in her amended pretrial memorandum, including (a) testimony by Kim Heath and Hugh Young, (b) evidence regarding settlements with Holman and Scott, and (c) events relating to Heath's case against the Board.

Following plaintiff's motion for reconsideration, I held that plaintiff could introduce the relevant testimony of Hugh Young because he was identified, although obliquely, and his deposition testimony was listed as an exhibit in plaintiff's pretrial memorandum and defendants would not be unfairly surprised by such evidence. I also held that plaintiff will be permitted to offer Williams, Self, Rankin, and Roadcloud to testify as to the objective, factual circumstances of their own respective experiences of discrimination at the Board to support the inference that defendants were motivated by a discriminatory animus. However, I limited their testimony and precluded these witnesses from testifying about: (1) their subjective perceptions or opinions of defendants' motives and intent behind their alleged discriminatory actions; (2) their legal conclusions with respect to their employment disputes with the Board; or (3) any civil actions, settled or otherwise, that they or other employees may have filed against the Board. I further permitted plaintiff to offer the testimony of Miller and Zappan for the limited purpose of testifying to the discriminatory statements allegedly made by defendants reflecting their discriminatory animus toward African American employees. Finally, I allowed plaintiff to offer

the testimony of Holman and Holmes subject to offers of proof that demonstrated: (1) that their testimony was sufficiently relevant to plaintiff's case; and (2) that their testimony was not cumulative, or that they would testify only as to 'smoking gun' statements allegedly made by defendants reflecting their discriminatory animus towards African American employees.  Each of the allowed witnesses testified at trial.  Defendants now argue that some of these witnesses should not have been permitted to testify and that certain aspects of other witnesses' testimony should not have been admitted into evidence.

a.      Inappropriate Witnesses

Defendants argue that five witnesses--Zappan, Young, Williams, Self, and Holman--should not have been permitted to testify because their testimony was irrelevant and unduly prejudicial.

Zappan retired from the Board in August 1998, approximately four years before Russ-Tobias was terminated.  He testified that he was told to target certain African American employees who were allegedly not doing their jobs, including Watkins, Self, and Rankin.  Defendants argue that he was asked numerous improper questions by plaintiff counsel regarding his knowledge of discrimination at the Board and employee's protests of discrimination and retaliation.

Young retired from the Board in August 1999.  He testified that he felt pressured by Jones to discipline Self for allegedly not doing his job but that Self appeared to be "fireproof" to discipline because he and others had been plaintiffs against the Board.  He also testified that he heard gossip about how the Board was out to get those people; a statement which should not have been admitted.

29

Williams resigned from the Board in May 1998 after he made complaints about discrimination and retaliation at the Board in the 1990s and complaints about his immediate supervisor in 1997 and 1998. Following plaintiff's counsel's objections, I precluded defense counsel from cross-examining Williams about his job related problems in 1994 and 1995.[4]

Self retired in May 1999 following an extended sick leave. He testified that prior to Jones' tenure as District Director in Philadelphia he had complained about discrimination and retaliation at the Board and that after Jones assumed that post the office atmosphere changed for the better. He also testified that he continued to receive disciplinary writeups that he believed to be discriminatory.

Holman was a clerical employee who knew Jones for years and retired in 2001. Contrary to my limiting Order, plaintiff's counsel asked her if she was a witness to racial discrimination and retaliation at the Board and whether she received discipline as a result. She answered in the affirmative and, without prompting, offered other testimony beyond her recollection of "smoking gun" statements.

Defendants argue that these witnesses' testimony was severely prejudicial and attempts to reargue the merits of its motions in limine with respect to "other employee" testimony. Specifically, defendants argue that Federal Rule of Evidence 404(b) precludes plaintiff from offering testimony and evidence of other discrimination cases involving the Board to show a mere propensity or disposition on the part of defendants to discriminate on the basis of race. Rule 404(b) states, in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a

_____

[4]I may reexamine this ruling at the new trial.

> person in order to show action in conformity therewith.  It may, however, be admissible
> for other purposes, such as proof of motive, opportunity, intent, preparation, plan,
> knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b) (2006).  "Rule 404(b) thus prohibits the admission of other acts evidence for

the purpose of showing that an individual has a propensity or disposition to act in a particular

manner."  Ansell v. Green Acres Contracting Co., Inc., 347 F.3d 515, 520 (3d Cir. 2003).  "Such

evidence may, however, be admitted if offered for a proper purpose apart from showing that the

individual is a person of a certain character."  Id.  To be admissible under Rule 404(b), other acts

evidence must meet the following four part test:

> (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant
> under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule
> 403; and (4) the district court must charge the jury to consider the evidence only for the
> limited purpose for which it was admitted.

Becker v. ARCO Chem. Co., 207 F.3d 176, 189 (3d Cir. 2000).  The evaluation of other acts

evidence "requires a more searching analysis which also focuses on the chain of logical

inferences supporting the proffered theory of logical relevance."  Id. at 191.  The proponent of

such evidence "must clearly articulate how that evidence fits into a chain of logical inferences, no

link of which may be the inference that the defendant has the propensity to commit the [offense

alleged]."  Id. (internal quotations omitted).

Defendants argue that plaintiff failed to establish how that evidence fits into a chain of

logical inferences to demonstrate intent or motive because: (i) the witnesses who testified as to

their complaints of discrimination during Jones tenure did not share any other facts in common

with Russ-Tobias; and (ii) they did not have personal knowledge of any alleged discrimination

taking place during the relevant time period.  Specifically, defendants argue:

The witnesses themselves did not work with plaintiff, and the events and interactions they described had no connection to plaintiff herself, or to the CCC units and their work, or to any of the events giving rise to plaintiff's termination.  Nor did the witnesses address themselves to situations that even resembled plaintiff's.

Defendants further argue that "four of the five witnesses had left the Board years before plaintiff's termination and could not possibly have first hand knowledge about what was going on there, and why, in 2002."  However, these witnesses' circumstances are sufficiently similar to those of Russ-Tobias to meet the relevance standard of Rules 401-02 and balancing considerations of Rule 403.  The first four witnesses share the following facts with Russ-Tobias: (a) they were all the subjects of or witnesses to alleged incidents of race discrimination at the Board; (b) they were all parole agents/supervisors at the Board; (c) they were all working in the Board's Philadelphia District; (d) they all worked under the supervision of Jones; and (e) all but Zappan were African American.  With respect to Holman, the Board argues that she "was with the Board until August 2001, but that was over two months before the confidential OPR investigation began and nearly a year before plaintiff's termination."  Moreover, defendants argue that "Holman was a member of the Board's support staff and, as such, would be less likely than a supervisor or manager to have pertinent factual knowledge."  Despite Holman's allegedly "off the wall" testimony and the facts that she was terminated a year before Russ-Tobias' termination and served only in a secretarial role, she was an African American employee working in the Board's Philadelphia District under Jones, she allegedly was the subject of and witness to race discrimination at the Board, and she allegedly witnessed certain "smoking gun" type statements.

Therefore, the testimony of these witnesses regarding race discrimination at the Board fits into the chain of logical inferences sufficient to support an inference of defendants' intent to discriminate against African Americans.  Specifically, the jury was entitled to believe from this evidence that defendants had an intent to purge the Philadelphia District of a number of African American employees.  Moreover, as I stated in my May 4, 2005 Order, I cannot escape Judge Becker's broad statement in <u>Fuentes v. Perskie</u>, that a plaintiff in an employment discrimination case can survive a defendant's summary judgment motion by showing, inter alia, "that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons."  32 F.3d 759, 765 (3d Cir. 1994); <u>see also</u> <u>McDonnell Douglas</u>, 411 U.S. at 804 (stating that evidence that employees of another race were treated differently from the plaintiff under comparable circumstances is "[e]specially relevant" to whether employer's proffered explanation is pretextual); <u>Ansell</u>, 347 F.3d at 521 ("Evidence of an employer's conduct towards other employees has long been held relevant and admissible to show that an employer's proffered justification is pretext.  . . . [O]ther acts are admissible under Rule 404(b) in the employment discrimination context for the proper purpose of establishing or negating discriminatory intent."); <u>Becker</u>, 207 F.3d at 194 n. 8 ("as a general rule, evidence of a defendant's prior discriminatory treatment of a plaintiff or other employees is relevant and admissible under the Federal Rules of Evidence to establish whether a defendant's employment action against an employee was motivated by invidious discrimination").

Defendants also argue that allowing these witnesses to testify to alleged acts of discrimination against them by defendants is substantially outweighed by the danger of unfair prejudice and waste of time resulting from a parade of witnesses, each recounting his contention that defendants had terminated him because of race.  See Fed. R. Evid. 403 (2006).  Defendants assert: (1) that they had no effective way of refuting this "other employee" evidence; (2) that it was impractical to conduct a minitrial on each of the employees' complaints of discrimination; (3) that defendants were seeking to diversify the Board's parole teams and (3) that it would have been equally unfeasible to counter plaintiff's parade of witnesses with defendants' own parade of witnesses to establish that the Philadelphia District was well run, that Jones was a good manager, and that there was no basis for plaintiff's witnesses' complaints, etc.

I disagree.  Defendants refuted, albeit not successfully, this "other employee" evidence, by introducing evidence to suggest that they did not have a discriminatory intent when disciplining and terminating the above witnesses who testified to their experiences and objective observations of race discrimination.  For example, defendants introduced evidence: (i) that white employees in circumstances similar to Russ-Tobias and those witnesses had been disciplined and terminated; (ii) that defendants had treated African American employees favorably with promotions and by placing African Americans in managerial positions; (iii) that defendants were trying to diversify the parole teams; and (iv) that Jones was the coach of softball team comprised predominantly of young African American girls.  In my view, allowing these witnesses to testify under the limitations imposed by my pretrial Orders did not constitute a prejudicial error of law.

34

b.      Inappropriate Testimony

Defendants also argue that plaintiff's counsel engaged in an inappropriate line of
questioning by repeatedly asking numerous witnesses questions about complaints against
defendants of discrimination and retaliation.  Defendants argue that by repeatedly raising the
subject of these complaints in this line of questioning, plaintiff's counsel conveyed to the jury the
incorrect notion that the complaints were factually true.  Defendants list nine examples of this
line of questioning.

Plaintiff's counsel generally asked Costa whether he was aware that there were a number
of complaints within the Board by various agents as to discriminatory treatment against them
based upon race.  Plaintiff's counsel also asked Costa specifically whether he heard of
complaints by Scott, by Rankin, by Roadcloud, by Watkins, by Holmes, and by Self.  In violation
of my Order, former union steward, Bill Hodge, was asked whether he felt that he was treated
disparately based upon his race.  Defense counsel's objection was sustained.  Plaintiff's counsel
asked Starling whether she was aware that Jones had demanded that he take action in retaliation
against some African American targeted individuals, whether in her opinion there was racial
disparity in the Board's apparently lenient treatment of Taylor, a white employee.  This latter
testimony was stricken but, as defendants recognize, it is impossible to un-ring the bell.
Plaintiff's counsel asked Taylor whether she had heard anything about any complaints of
discrimination or retaliation based upon race at the Board.  He asked Scicchitano about his
knowledge of discrimination and retaliation complaints by Zappan, Rankin, Williams, Holmes,
Watkins, Burton, Scott, and Roadcloud.  At side bar, following defense counsel's objections, I
told counsel that Scicchitano could be asked about complaints made during Jones' tenure.

35

Plaintiff's counsel continued his line of questioning by asking more questions about complaints made by those employees and how their complaints were handled.

Plaintiff's counsel asked Robinson about Zappan's contention that Jones was requesting that he retaliate against a specific African American agent who had previously complained about discrimination and retaliation at the Board. Plaintiff's counsel followed this question with others regarding Burton, Scott, and Watkins. I overruled defense counsel's objections. In a similar vein, plaintiff's counsel asked Marshall successive questions about a number of complaints of retaliation and discrimination involving the Philadelphia District under Jones, about complaints of retaliation relating to previous complaints of discrimination from Rankin, Watkins, Holmes, Williams, Self. Plaintiff's counsel followed these questions with more, asking about complaints that Jones retaliated against those individuals who had previously filed complaints of racial discrimination and retaliation against defendants. Plaintiff's counsel asked Marshall whether he knew that Jones had a pattern of retaliation and was out to get Russ-Tobias. Finally, plaintiff's counsel asked Ingram questions about complaints by the same group of former agents--Williams, Zappan, Watkins, Scott, Self, and Holman. I sustained plaintiff's objections to defense counsel's redirect of Ingram in which she asked about the outcomes of these complaints. Plaintiff's counsel also asked Tuttle whether he had learned of a series of complaints of racial discrimination in the Philadelphia District.

Defendants argue that this repetitive line of questioning regarding other employee's complaints, some of which were settled, is tantamount to allowing evidence of settlements in violation of Federal Rule of Civil Procedure 408, and inadmissible character evidence proscribed by Becker, as discussed above. Defendants also argue that other employees' complaints of

discrimination are not sufficient to show the employer has discriminated against other members of his protected class or other protected categories of persons because they are mere complaints and not legal findings of fact.  In sum, defendants argue that my evidentiary rulings before and during trial with respect to other employee evidence led to an unfavorable verdict.  However, defense counsel could have pursued a parallel line of questioning with her witnesses on direct and plaintiff's witnesses on cross regarding incidents that appeared to suggest that defendants did not have a discriminatory intent or had an intent to improve race relations at the Board. Defendants have failed to show that I committed a prejudicial error of law in my evidentiary rulings at trial with respect to "other employee" evidence.

2.      The OPR Report

        Defendants also argue that I committed a prejudicial error of law by failing to allow the OPR report and attachments to go out with the jury for their deliberations.  All other exhibits were permitted to enter the jury room, but I declined to send the OPR report, including a copy inserted into defendants' exhibit binder, to the jury room unless the jury specifically asked for it. Defendants argue that this ruling telegraphed to the jury that the OPR report was second class evidence, not worthy of review.  Defendants further argue that this action prevented the jury from giving full and fair consideration to all the evidence and was prejudicial to defendants.  I agree that, viewed in comparison with the Auditor General's report which was allowed into the jury room, my withholding of the OPR report was prejudicial to defendants' defense with respect to the jury's determination on the pretext element.  I will allow the OPR report into the jury room in the new trial.  See Young v. Lukens Steel Co., 881 F. Supp. 962, 975 (E.D. Pa. 1994) ("The decision of whether or not to send an exhibit to the jury room lies within the sound discretion of

the district court.").  In the new trial, the OPR report will not be admitted for the truth of its

contents except with respect to the statements made by Russ-Tobias in the investigation, which

are properly admitted for the truth as admissions of a party opponent.  See Fed. R. Evid.

801(d)(2) (2006).

3.      Plaintiff's Counsel and Witnesses

       Additionally, defendants take issue with the cumulative nature of plaintiff's witnesses'

overstepping the limits placed on their testimony and plaintiff's counsel's discussion of

inadmissible evidence before the jury despite my frequent instructions to the witnesses,

admonishments of counsel, and instructions to the jury to disregard such evidence.  While a

concern of mine during trial, I decline to hang my hat on this reason for granting defendants'

motion for a new trial or reconsidering my "other employee" evidentiary rulings.  See Fineman v.

Armstrong World Indus., Inc., 980 F.2d 171, 207-08 (3d Cir. 1992) ("the combination of the

following improprieties by plaintiff's counsel constituted grounds for a new trial: . . . he asserted

his personal opinion of the justness of his client's cause; [] he prejudicially referred to facts not

in evidence. . ."); Salas v. Wang, 846 F.2d 897 (3d Cir. 1988) (an isolated improper remark will

not support the grant of a new trial).  Should this issue resurface at the new trial, counsel is put

on notice that such behavior will not be tolerated.

C.      Weight of the Evidence

       Defendants concede that it faces an uphill battle with the standard of review for new trials

based on the weight of the evidence.  As discussed above, when the verdict is alleged to be

against the weight of the evidence, a district court's discretion is more limited.  See Klein, 992

F.2d at 1290.  "[N]ew trials because the verdict is against the weight of the evidence are proper

only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson, 926 F.2d at 1353.  Moreover, the type of case at hand also factors into the scope of the court's discretion: "Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations." Id. at 1352.

As discussed with respect to plaintiff's Title VII and PHRA discrimination claims under the standard governing judgments n.o.v., I did not find that there was insufficient evidence to support the jury's verdict against the Board and Jones.  Now, viewing the evidence supporting plaintiff's Title VII and PHRA discrimination claims under the standard for new trials, I do not find that the jury's verdict on plaintiff's discrimination claims resulted in a miscarriage of justice, cries out to be overturned, or shocks my conscience for substantially the same reasons as discussed above.  However, I will address defendants's arguments that the jury's verdict with respect to plaintiff's Section 1981 retaliation claim was against the weight of the evidence pursuant to Rule 50(c)(1).

1.      Prima Facie Case for Retaliation

To establish a prima facie case of retaliation under Section 1981, a plaintiff must show: "(1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action." See, e.g., Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (Section 1981 retaliation); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997) (Title VII

39

retaliation).[5]  Defendants argue that Russ-Tobias failed to meet the prima facie case for

retaliation.  I disagree.  If my conclusion with respect to Section 1981, discussed above, is

deemed erroneous, defendants' arguments do not support a motion for a new trial.

a.      Protected Activity

"[P]rotesting what an employee believes in good faith to be a discriminatory practice is

clearly protected conduct."  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir.

1996).  Thus, "a plaintiff need not prove the merits of the underlying discrimination complaint,

but only that he was acting under a good faith, reasonable belief that a violation existed."  Id.

(internal quotations omitted).  However, defendants assert: (a) that generalized complaints about

unfair treatment do not constitute the requisite protected conduct necessary for a prima facie case

of retaliation, see Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995) (ADEA

retaliation); (b) that "opposing the conduct of the defendants cannot be protected activity if no

reasonable person could have believed that the actions taken by the defendants about which the

plaintiff complained violated [the law]," see McKenna v. City of Phila., No. 98-5835, 2003 WL

171373, at *8 (E.D. Pa. Jan. 17, 2003) (Title VII); and (c) that "[a] plaintiff must not only show

that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful

employment practices, but also that his belief was objectively reasonable in light of the facts and

record presented," see Fogleman v. Greater Hazleton Health Alliance, 122 Fed. Appx. 581, 583-

84 (3d Cir. 2004) ("It thus is not enough for a plaintiff to allege that his belief in this regard was

---

[5]The elements of a prima facie case for retaliation are the same under Section 1981 and
Title VII.  See Cardenas, 269 F.3d at 263.

honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.") (Title VII).

i.        Generalized Complaints

Because she never put her complaint of retaliation into written form defendants focus their arguments on what Russ-Tobias said to Jones and Ingram and argue that the evidence does not suggest that Russ-Tobias asserted anything more than generalized grievances.  With respect to her communications with Jones, Russ-Tobias testified: (i) that she told Jones that "[she] didn't feel that [she] should be transferred to the unit"; (ii) that she asked Jones "why Ms. Roth was allowed to leave the unit voluntarily and [she] was involuntarily being made to be put in the unit"; (iii) that she asked Jones that "[i]f the unit was already understaffed and needed . . . a seasoned female agent to do the work in the unit" why was the female agent he had in the unit allowed to leave and Russ-Tobias forced into that unit; (iv) that she told Jones that she was concerned about the number of cases handled in CCC #3 with so few agents and if she took over for Roth she would have an enormous caseload; (v) that she told Jones that she wanted to stay in Ferguson's unit and not leave Ferguson's team short handed; (vi) that she told Jones that she did not want to work under Taylor; and (vii) that she told Jones that she did not think the procedures used to select her for transfer were fair.

With respect to her communications with Russ-Tobias, Ingram testified: (a) that Russ-Tobias expressed concern that she was being investigated by OPR and wanted to know what she could do about it; (b) that Ingram advised Russ-Tobias to await the conclusion of the investigation, because only then would she know whether there was a basis for any discrimination complaint as the investigation might clear her of any claims of wrongdoing; and

(c) that Ingram thought Russ-Tobias would get back to her, but that she never did.  Russ-Tobias

testified that she "let [Ingram] know that [she] thought [she] was being discriminated against, as

far as with [her] being made to go into a unit where they let a white agent out and [she] was to be

put in that place" and that her conversation with Ingram may have been at the time of the transfer

or at the time of the OPR report.

Defendants concede that while Russ-Tobias "viewed the possibility of working in CCC

#3 as highly undesirable," "did not understand how she was chosen for this distasteful

assignment," and made it clear to Jones and Ingram that she did not want this assignment.

However, the contend that there is no evidence from which the jury could infer that Russ-Tobias

said anything to Jones about possible race discrimination.  I disagree.  It appears from this

testimony that Russ-Tobias told Jones and Ingram that she thought it was unfair of Jones to

transfer her into CCC #3 because of the work load, that she suspected that the transfer was

motivated by race discrimination, and that she considered filing a formal written complaint of

race discrimination.  A reasonable jury could have interpreted this testimony to find that Russ-

Tobias asserted more than just generalized grievances.

ii.      Objectively Reasonable

Defendants also argue that Russ-Tobias' grievances cannot be considered objectively

reasonable.  See Zappan v. Pa. Bd. of Probation and Parole, 152 Fed. Appx. 211, 218 (3d Cir.

2005) ("[S]imply opposing an employment practice does not rise to the level of a protected

activity if no reasonable person could believe that the actions complained of were unlawful.").  In

addition to the evidence described above, defendants focus on the following pieces of evidence:

(i) plaintiff's counsel's questioning of Nealy as to whether she was "aware that Ms. Russ made a

complaint of discrimination about [the transfer] incident"; (ii) Russ-Tobias's response to her counsel's questioning concerning her feelings about the racial considerations involved in her transfer, "Because Dana Roth was in that unit, she was one of my peer parole agents and she was apparently allowed to transfer out of the unit.  And I was supposed to go in and take her place"; (iii) plaintiff's counsel's questioning of Hodge as to whether he was "aware of any white agents who were ever involuntarily transferred into a position where, that they did not want, that they had seniority that allowed them not to have to do it, and where the position contains problems" and Hodge's answer in the negative; and (iv) testimony that the parole agents in CCC #2 were all white.

Defendants argue that this evidence does not constitute proof that Russ-Tobias made an objectively reasonable complaint of discrimination but rather shows that changes in job assignments are unrelated to race because other evidence suggests that both white (Roth and Taylor) and minority ( Harris, Ferguson, and Newton) employees were given voluntary transfers. By the same token, defendants assert that both whites (Young) and minorities (Russ-Tobias) had been transferred involuntarily.  Defendants also argue that Russ-Tobias' testimony that she knew of complaints about Taylor's hostility toward African American parolees at Hannah House and that she did not want to work for a particular supervisor does not demonstrate that she made an objectively reasonable complaint to Jones about race discrimination.  Furthermore, defendants argue that "[n]o reasonable person could believe that directing an apparently competent African American parole agent to take over a large and difficult case load was an act of discrimination" because: (a) such a belief "would mean that the Board would have had no choice but to place a white agent in Ms. Roth's former position," and, in effect, force "the Board to assign people to

positions according to skin color"; and (b) "[i]t is demeaning to suggest that an African

American, especially an ostensibly capable one (as plaintiff constantly portrayed herself), would

not be able to cope with a challenging assignment."  Defendants argue that no reasonable person

could believe that the complained of transfer amounted to race discrimination because the

transfer had already been rescinded by the time Russ-Tobias called Ingram to discuss the OPR

report.

 I disagree.  Although the evidence could support the interpretation asserted by defendants,

a reasonable jury could have interpreted this testimony to find that Russ-Tobias' suspicions of

race discrimination were legitimate.  With at least two reasonable interpretations of the evidence

in view, I will not second guess the jury's interpretation.

b. Adverse Employment Action

 Retaliatory conduct is considered an adverse employment action if it causes "a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits."

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  In order to rise to the level of

adverse employment action, the retaliatory conduct must be "serious and tangible enough to alter

an employee's compensation, terms, conditions, or privileges of employment."  Cardenas, 269

F.3d at 263 (internal quotations omitted).  However, "not everything that makes an employee

unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an

irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination

suit."  Robinson, 120 F.3d at 1300 (internal quotations omitted) (holding that allegations of

"unsubstantiated oral reprimands" and "unnecessary derogatory comments" following complaint

did not rise to the level of adverse employment action); Gagnon v. Sprint Corp, 284 F.3d 839,

850 (8th Cir. 2002) ("[O]stracism and rudeness by supervisors and coworkers do not rise to the

level of an adverse employment action.") (abrogated on other grounds).  Defendants focus their

arguments on three possible adverse employment actions: the transfer to CCC #3, the OPR

investigation, and the termination.

i.      The Transfer

Defendants argue that the transfer cannot support the adverse employment element of

Russ-Tobias' prima facie case because the planned transfer of Russ-Tobias from CCC #1 to CCC

#3 is not serious or tangible enough to result in a significant change in her employment status,

see Easter v. Grassi, 51 Fed. Appx. 84, 85 (3d Cir. 2002) (holding that transfer not adverse

employment action because plaintiff failed to allege that transfer "either substantially decreased

her earning potential or resulted in significant disruption."); Shramban v. Aetna, 262 F. Supp. 2d

531, 538 (E.D. Pa. 2003) (holding that plaintiff failed to demonstrate that she suffered any

adverse employment action because plaintiff's transfer to another project team did not constitute

a demotion, plaintiff's duties and position remained substantially the same, and her pay and her

opportunities for advancement in the company were not diminished), and the transfer was

rescinded and she never changed assignments, see Spriggs v. Public Serv. Comm'n of Md., 197

F. Supp. 2d 388, 393-94 (D. Md. 2002) ("reversed or rescinded actions thus cannot form the

basis for vicarious liability under the employment discrimination laws"); Walker v. Wash. Metro.

Area Transit Auth., 102 F. Supp. 2d 24, 29 (D.D.C. 2000) ("An employment decision does not

rise to the level of an actionable adverse action, however, unless there is a tangible change in the

duties or working conditions constituting a material employment disadvantage. . .  Moreover, it

45

bears emphasizing that [defendant] rescinded the disciplinary notice shortly after it was issued.")
(internal quotations omitted).  I agree with defendants that the rescinded transfer does not
constitute an adverse employment action because although the transfer was to an undesirable
assignment with a greater workload the transfer would not have changed her salary, benefits, or
work duties in any tangible way and it was rescinded before she was forced to change
assignments.

ii.      The OPR Investigation

       With respect to the OPR investigation, defendants argue that an investigation, in and of
itself, is not an adverse employment action.  See Newton v. Meijer Stores Ltd. P'ship,
347 F. Supp. 2d 516, 524 (N.D. Ohio 2004) (holding that "an investigation is not an adverse
employment action" because the investigation "did not materially change the terms and
conditions of his employment").  I agree with defendants that the OPR investigation alone is not
an adverse employment action.  However, the OPR investigation coupled with a subsequent
termination does constitute an adverse employment action.  The two cannot be separated.  The
OPR investigation and its subsequent findings directly caused and supported the reason for Russ-
Tobias' termination.  But for the OPR investigation, it is possible that Russ-Tobias would not
have been terminated.  As discussed below, the jury could have found that the initiation of an
OPR investigation was tantamount to discipline.

iii.      The Termination

       Defendants acknowledge that Russ-Tobias' termination constitutes an adverse
employment action.  However, defendants argue that no reasonable jury could conclude that any

of the defendants other than the Board effectuated the termination.  With respect to Jones,

defendants argue that there is insufficient evidence to support a finding that Jones, himself, took

an adverse employment action against Russ-Tobias.

The Court of Appeals for the Fourth Circuit has held that the federal employment

discrimination laws "do not limit the discrimination inquiry to the actions or statements of formal

decisionmakers for the employer" because such a construction "would thwart the very purposes

of the acts by allowing employers to insulate themselves from liability simply by hiding behind

the blind approvals, albeit non-biased, of formal decisionmakers."  Hill v. Lockheed Martin

Logistics Mgmt., Inc., 354 F.3d 277, 290-91 (4th Cir. 2004) citing Reeves, 530 U.S. at 151-52.

However, the Fourth Circuit held:

> [W]e decline to endorse a construction of the discrimination statutes that would allow a
> biased subordinate who has no supervisory or disciplinary authority and who does not
> make the final or formal employment decision to become a decisionmaker simply because
> he had a substantial influence on the ultimate decision or because he has played a role,
> even a significant one, in the adverse employment decision.

Hill, 354 F.3d at 291.  In support of this viewpoint, the Fourth Circuit stated:

> We can discern no precedential or practical basis upon which to depart from the inquiry
> as articulated and applied by the Supreme Court in Reeves-and to expand the contours of
> the acts-by embracing a test that would impute the discriminatory motivations of
> subordinate employees having no decisionmaking authority to the employer, and make
> them agents for purposes of the employment acts, simply because they have influence or
> even substantial influence in effecting a challenged decision.  Regarding adverse
> employment actions, an employer will be liable not for the improperly motivated person
> who merely influences the decision, but for the person who in reality makes the decision.

Id.  Therefore, the Fourth Circuit concluded that with respect to adverse employment actions "an

aggrieved employee who rests a discrimination claim . . . upon the discriminatory motivations of

a subordinate employee must come forward with sufficient evidence that the subordinate

employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer." Id.  Agreeing with the Fourth Circuit's holding in Hill--that "[r]egarding adverse employment actions, an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision," 354 F.3d at 291--the Court of Appeals for the Third Circuit has held that a decisionmaker cannot simply retain "rubber stamp" authority in order to insulate lower level supervisors from decisionmaker status.  Foster v. New Castle Area Sch. Dist., 98 Fed. Appx. 85, 88 (3d Cir. 2004).

Defendants argue that although Jones had a role in Russ-Tobias' termination he did not terminate her because he was neither the actual decisionmaker nor was he principally responsible for her termination.  The evidence reveals that the Board has centralized its discipline process in an attempt to ensure fair and uniform disciplinary actions.  Supervisors and managers at the Board, like Jones, do not act independently in disciplinary actions and they are not permitted to discipline their subordinates on their own.  They can only initiate disciplinary proceedings by contacting the central Personnel Office in Harrisburg and getting approval.  It is the Personnel Office that decides whether there will be a Predisciplinary Conference in each case and, if there is one, what action to implement following the PDC.  Local supervisors and managers, including District Directors, are not expected or allowed to recommend a particular form of discipline in a PDC.

Russ-Tobias appears to argue that once Jones requested the investigation, her termination was a fait accompli and, therefore, that Jones' request for the investigation was tantamount to terminating her.  Defendants argue that one cannot equate a request for an OPR investigation

48

with disciplinary action or infer that disciplinary action was inevitable because "[e]very request for an investigation goes through multiple hands before reaching the OPR director, [] he does not accept every request," "of the investigations that are done, the allegations are sustained only about half the time," and "in many cases the employee cleared."  Furthermore, defendants argue that Jones' participation in the Board's disciplinary process did not transform him into the one who terminated Russ-Tobias.

Although Jones conducted a PDC for Russ-Tobias and recommended appropriate disciplinary action, the following actions took place before Russ-Tobias was terminated: (1) Regional Director Costa reviewed Jones' report and forwarded it to the Personnel Office; (2) Labor Relations Coordinator Marshall reviewed the record and recommended that she be terminated; (3) Personnel Director Marcinko concurred in her termination; and (4) Director of Human Resources Scicchitano and Director of the Office of Probation and Parole Services Tuttle reviewed and approved the recommended termination.  Ultimately, it was Mike Neumyer, Director of the Office of Management Services, on behalf of Chairman, William Ward, who terminated Russ-Tobias by letter.  Defendants thus argue that Jones was not the decisionmaker for Russ-Tobias' termination because "the Board, acting through its Chair and its Director of Management Services, made an independent decision, based upon the recommendation of Tuttle and Scicchitano, who in turn had made their own independent decisions based upon the information and recommendations presented to them."  Moreover, defendants argue that although there is evidence that Jones is a demanding manager and wields power over his subordinates there is no evidence to suggest that he exerts any influence over those above him or outside of his chain of command.

I disagree.  Although Jones ultimately did not wield the axe that terminated Russ-Tobias'

employment, the jury could have found Jones to have been the actual decisionmaker because it

could have interpreted the evidence as follows: from among the majority of parole agents with

poor work performances (as evidenced by the Auditor General's report) Jones singled out Russ-

Tobias for a comprehensive investigation by OPR (applying strict standards that did not

accommodate for the rampant nature of poor work performance at the Board) while allowing the

other underperforming agents to escape OPR investigation and thus escape termination.  In other

words, the jury could have believed that: (a) because of the rampant nature of parole agent

misconduct and underperformance, termination was the inevitable outcome of an OPR

investigation of any parole agent; (b) because Jones only requested an OPR report for Russ-

Tobias, he selected her for inevitable termination; and (c) because Jones selected Russ-Tobias for

an OPR investigation, he was the actual decisionmaker behind her termination.

c.      Causal Connection

        Defendants contend that there insufficient evidence to find a causal connection between

plaintiff's October 2001 complaint to Jones about the impending transfer or her telephone

conversation with Ingram, discussed above, and the Board's decision to terminate her seven

months later in June 2002.  Defendants assert two arguments in support of this position.

        First, defendants argue that "[t]here cannot be a causal connection between a person's

protected activity and a later adverse employment action against that person unless whoever takes

the adverse employment action has knowledge of the protected activity."  See Ambrose v.

Township of Robinson, Pa., 303 F.3d 488, 493 (3d Cir. 2002) (finding in First Amendment

retaliation case that "[i]t is only intuitive that for protected conduct to be a substantial or

motiving factor in a decision, the decisionmakers must be aware of the protected conduct.")
citing Allen v. Iranon, 283 F.3d 1070, 1076 (9th Cir. 2002) (finding in First Amendment
retaliation case that "[i]n order to retaliate against an employee for his speech, an employer must
be aware of that speech.") ; cf. Geraci v. Moody-Tottrup, Int'l, Inc., 82 F.3d 578, 581 (3d Cir.
1996) ("We cannot presume that an employer most likely practiced unlawful discrimination
when it did not know that the plaintiff even belonged to the protected class. . . .  In other cases
involving personal attributes not obvious to the employer, courts have regularly held that the
plaintiff cannot make out a prima facie case of discrimination unless he or she proves that the
employer knew about the plaintiff's particular personal characteristic.").

With respect to Jones, defendants focus their arguments on the evidence of his intent.
Defendants argue that the Board's state of mind cannot be imputed to Jones, or vice versa.  Cf.
Cerutti v. BASF Corp., 349 F.3d 1055, 1063 (7th Cir. 2003) ("[Plaintiff's] evidence of
[individual defendants'] alleged animus toward older workers is relevant only if there is other
evidence from which a reasonable jury could infer that their animus influenced the [corporate]
deliberations to such a degree so as to result in the plaintiffs' terminations.").

With respect to Ingram, defendants argue that Russ-Tobias' telephone conversation with
Ingram could not have caused the Board's subsequent termination action because there is no
evidence that anyone other than Ingram knew about that call at the relevant time.  Following that
phone call, Ingram did not open an investigation, tell anyone about the conversation, or take any
other action.  Robinson, Marshall, and Tuttle all testified that they were not aware of any
complaint that Russ-Tobias may have made to Ingram.  Marcinko testified that she does not learn
of any complaints to the EEO Officer unless, and until, a completed EEO investigation becomes

a factor in disciplinary proceedings.  Here, there was no investigation following Russ-Tobias'

conversation with Ingram.  Defendants assert that the only one who may have known about the

conversation with Ingram was Ingram's supervisor, Scicchitano, who did not pursue any

investigation.

 With respect to other Board employees, defendants argue that the individuals above or

outside Jones' chain of command who reviewed, recommended, and approved Russ-Tobias'

termination--Robinson, Nealy, Marshall, and Tuttle--did not have any knowledge of the plan to

transfer Russ-Tobias to CCC #3, her discussion with Jones protesting the planned transfer, or the

rescission of the planned transfer.  Defendants argue that although other Board employees--

Scicchitano, Marcinko, Costa, and Ferguson--may have had knowledge of the events surrounding

the planned transfer there is no evidence to suggest that their knowledge of her complaint caused

them to "side" with Jones with respect to his request for an OPR investigation or

recommendation for appropriate discipline.

 Defendants arguments are premised on their view that Jones' initiation of the OPR

investigation did not constitute an adverse employment action.  However, as discussed above, the

OPR investigation is interrelated with the termination and constitutes one entire adverse

employment action.  The jury reasonably could have determined that Jones request for the OPR

investigation and Russ-Tobias' inevitable termination was causally connected to Jones' desire to

retaliate against her for thwarting his attempt to transfer her into a position where she would fail.

Jones' alleged intent to retaliate can be imputed to the Board itself because the jury reasonably

could have found: (i) that Jones was the actual decisionmaker for her termination; and (ii) that

the Board seized on the opportunity created by Jones' initiation of an OPR report and, driven by

its own racial animus, pursued a prosecutorial investigation against Russ-Tobias.

Second, defendants argue that there is insufficient evidence of a temporal proximity

between the her complaint and the OPR investigation and her termination to establish a causal

connection.  The Court of Appeals has held that while "[t]here have been cases in which the

temporal relation between an adverse employment action and the protected activity has enabled

the court to draw the inference of causal relationship . . . temporal proximity alone will be

insufficient to establish the necessary causal connection when the temporal relationship is not

unusually suggestive."   Cardenas, 269 F.3d at 263 (internal citations and quotations omitted);

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) ("[W]here there is a lack

of temporal proximity, circumstantial evidence of a pattern of antagonism following the

protected conduct can also give rise to the inference."); Robinson, 120 F.3d at 1302 ("[T]he mere

fact that adverse employment action occurs after a complaint will ordinarily be insufficient to

satisfy the plaintiff's burden of demonstrating a causal link between the two events.").

Defendants argue that the seven months between plaintiff's complaint of discrimination

and her termination are not sufficiently suggestive of retaliation to prove causation.  Although

defendants admit that the OPR investigation was underway during these seven months, they

contend that certain facts during this time period suggest that plaintiff was not being retaliated

against.  For example, Ferguson encouraged Russ-Tobias to take it easy in the wake of her knee

injury, Russ-Tobias' request for modified duty was approved, she was not chastised or

reprimanded, and both Ferguson and Nealy gave her excellent evaluations.  With respect to the

53

OPR investigation, defendants argue that the pendency of the OPR investigation is not proof of retaliation or antagonism because it had already begun and employers need not "stop dead in its tracks the moment it learns that an employee has engaged, or may have engaged, in protected activity." Cf. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

I do not find defendants arguments in this regard persuasive.  A reasonable jury could have found the lack of direct antagonism toward Russ-Tobias during the period of the investigation suggested that the Board was merely keeping up pretenses with Russ-Tobias while it built up its case to support her eventual termination.  The Court of Appeals has emphasized: "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.  When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation." Kachmar, 109 F.3d at 178.  Moreover, the Court of Appeals has held that "an atmosphere of condoned racial harassment in a workplace increases the likelihood of retaliation for complaints in individual cases." Woodson v. Scott Paper Co., 109 F.3d 913, 923 (3d Cir. 1997) (internal quotations omitted).  In other words, "evidence of condoned harassment can support an inference by the fact-finder that the employee, having failed to respond to the harassment, also engaged in retaliatory conduct against the plaintiff." Id. Plaintiff's evidence of racial harassment reasonably supported the jury's determination.

The jury's factual determinations were not unreasonable.  Presuming the viability of plaintiff's Section 1981 retaliation and discrimination claims, the verdict does not cry out to be overturned or shock my conscience.  Moreover, I find that the subject matter of this litigation was within this jury's understanding.  I would not order a new trial on this basis.

III.     Appeal

A.     Rule 54(b)

Because I have ruled in favor of all defendants with respect to plaintiff's Section 1981 retaliation and discrimination claims, I will enter final judgment on these claims pursuant to Federal Rule of Civil Procedure 54(b).  Rule 54(b) provides, in relevant part, that when an action involves more than one claim or party "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."  "The rule attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties."  Allis-Chalmers Corp. v. Phila. Elec. Co., 521 F.2d 360, 363 (3d Cir. 1975).

Although the Supreme Court has held that the entry of final judgment pursuant to Rule 54(b) "is left to the sound judicial discretion of the district court" and "is to be exercised in the interest of sound judicial administration," Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8 (1980), the Court of Appeals has cautioned that Rule 54(b) orders should be entered "only in the infrequent and harsh case as an instrument of justice and the more satisfactory disposition of litigation in the light of the public policy indicated by statute and rule."  Allis-Chalmers, 521 F.2d at 363.  In addition, a district court must "clearly articulate the reasons and factors

underlying its decision to grant 54(b) certification," Id. at 364; Waldorf v. Shuta, 142 F.3d 601, 611 (3d Cir. 1998).

In deciding whether to direct the entry of final judgment under Rule 54(b), a district court must find: (1) that there is a "final judgment"; and (2) that there is "no just reason for delay." See Curtiss-Wright, 446 U.S. at 7; Waldorf, 142 F.3d at 610. In defining the term "final judgment," the Supreme Court has held that "[i]t must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action." Curtiss-Wright, 446 U.S. at 7; Gerardi v. Pelullo, 16 F.3d 1363, 1368 (3d Cir. 1994) ("Finality is defined by the requirements of 28 U.S.C. § 1291, which are generally described as 'ending the litigation on the merits and leav[ing] nothing for the court to do but execute the judgment."). My holding with respect to Section 1981 is a final judgment because it terminates plaintiff's discrimination claims against the individual defendants and plaintiff's retaliation claims against all defendants.

"[I]n deciding whether there are no just reasons to delay the appeal of individual final judgments in a setting such as this, a district court must take into account judicial administrative interests as well as the equities involved." Curtiss-Wright, 446 U.S. at 8. Although courts typically consider a number of nondispositive factors--"(1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final;

and (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like," Allis-Chalmers, 521 F.2d at 364--I do not find these factors as persuasive as the Court's interest in preserving judicial economy.

There is significant difference of opinion among the Courts of Appeals, compare Fed'n of African Am. Contractors v. City of Oakland, 96 F.3d 1204 (9th Cir. 1996) with Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995) and Johnson v. City of Fort Lauderdale, 903 F. Supp. 1520 (S.D. Fla. 1995) aff'd 114 F.3d 1089 (11th Cir. 1997), and within this District, compare Roadcloud v. Pa. Bd. of Probation & Parole, No. 05-3787, 2006 WL 83453 (E.D. Pa. Jan. 6, 2006) with Watkins v. Pa. Bd. of Probation & Parole, No. 02-2881, 2002 WL 32182088 (E.D. Pa. Nov. 25, 2002), as to whether Section 1981 creates an independent cause of action. However, as discussed above, the Court of Appeals for the Third Circuit has yet to rule on this question.

I conclude that Section 1981 does not create an independent cause of action, hold that my instructions to the jury were erroneous, and have determined that it is necessary to order a new trial on plaintiff's Title VII and PHRA discrimination claims against the Board because the damages award for discrimination was not separated from that for retaliation. Should the Court of Appeals determine that Section 1981 does create an independent cause of action, a new trial of plaintiff's claims against the Board would not be necessary because there would be no need to separate the damages award between plaintiff's discrimination and retaliation claims. Before embarking on a new trial to determine liability on plaintiff's Title VII and PHRA discrimination

claims and thus the proper amount of damages for such liability if liability be found, I find that

allowing plaintiff to appeal my holding with respect to Section 1981 is in the interests of judicial

economy.

B.      Section 1292(b)

I will certify the remainder of this Order for interlocutory appeal pursuant to 28 U.S.C. §

1292(b) so that the Court of Appeals may address each of these issues in the context of the entire

case, should it choose to do so.  A district court may certify an order for an interlocutory appeal if

it is "of the opinion that such order involves a controlling question of law as to which there is

substantial ground for difference of opinion and that an immediate appeal from the order may

materially advance the ultimate termination of the litigation, he shall so state in writing in such

order."  28 U.S.C.  1292(b) (2006).  In other words, I may certify an interlocutory order for

immediate appeal where that order meets three conditions: "[t]he Order must (1) involve a

controlling question of law, (2) offer grounds for difference of opinion as to its correctness, and

(3) if appealed immediately[,] materially advance the ultimate termination of the litigation."

Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3d Cir. 1974).[6]

Although a trial court has discretion in determining whether to certify, certification is

only appropriate in exceptional circumstances and "a district court should be mindful of the

_____

[6]While neither party has formally moved for certification of this interlocutory order, I
have the authority under Section 1292(b) to certify the order sua sponte.  See Amerisourcebergen
Drug Corp. v. Meier, No. 03-6769, 2005 WL 2645000, at *3 (E.D. Pa. Oct. 14, 2005); Zenith
Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 494 F. Supp. 1190, 1243 (E.D. Pa. 1980) ("We
have the authority to certify our order under § 1292(b) sua sponte.  Because we are certain that
the order should be certified, and in order to save the time that would be consumed by
proceedings on a separate motion for certification, we have decided to include the certification in
the order granting summary judgment.").

strong policy against piecemeal appeals when exercising its discretion." <u>Bradburn Parent</u>

<u>Teacher Store, Inc. v. 3M</u>, No. 02-7676, 2005 WL 1819969, at *3 (E.D. Pa. Aug. 2, 2005). "The

key consideration . . . is whether [the order] truly implicates the policies favoring interlocutory

appeal," including "the avoidance of harm to a party pendente lite from a possibly erroneous

interlocutory order and the avoidance of possibly wasted trial time and litigation expense." <u>Katz</u>,

496 F.2d at 756.  With these principles in mind, I turn to the relevant factors.

 "A controlling question of law must encompass at the very least every order which, if

erroneous, would be reversible error on final appeal." <u>Id.</u> at 755.  However, an order need not

"be determinative of any of plaintiff's claims on the merits . . . [n]or need a reversal of the order

terminate the litigation." <u>Id.</u>  Rather, "controlling means serious to the conduct of the litigation,

either practically or legally.  And on the practical level, saving of time of the district court and of

expense to the litigants [is] deemed . . . to be a highly relevant factor." <u>Id.</u>  There are five

controlling issues of law involved in this Order that meet the test for interlocutory appeals: under

the standard for judgment as a matter of law, (a) whether there is sufficient evidence for a

reasonable jury to conclude that the Board discriminated against Russ-Tobias in violation of Title

VII and PHRA; and, under the standard for new trials, (b) whether it is necessary to conduct a

new trial in light of the fact that the jury's award of damages for discrimination is inseparable

from that for retaliation; (c) whether my ruling with respect to "other employee" evidence was

proper; (d) whether the weight of the evidence supports the jury's determination that the Board

and Jones discriminated against Russ-Tobias in violation of Title VII and PHRA; and (e) should

the Court of Appeals vacate my judgment with respect to Section 1981, whether the weight of the

evidence supports the jury's determination that defendants retaliated against Russ-Tobias.

"Substantial grounds for difference of opinion exist when there is genuine doubt or

conflicting precedent as to the correct legal standard." Bradburn, 2005 WL 1819969, at *4.

Here, grounds (a), (b), (d), & (e) are central issues in this case and have been disputed

consistently from the summary judgment stage through post trial motions.  The parties'

contrasting points of view on these issues are discussed at length above.  Also discussed above,

ground (c) was the subject of much dispute in a motion in limine, motion for reconsideration of

my ruling thereon, and at trial.

In assessing the requirement of a likelihood of materially advancing the ultimate

termination of the litigation, "[t]he district court's opinion about settlement possibilities, about

the potential length of a possibly avoidable trial, and similar matters" is crucial.  Katz, 496 F.2d

at 754.  By clarifying the state of the law on these issues, a determination by the Court of Appeals

will either restore the jury's verdict, expedite the new trial, or facilitate a settlement.  Should the

Court of Appeals review these issues, the district court and the parties would be saved the

needless expenditure of time and money in litigating issues that the Court of Appeals may vacate

or reverse upon ultimate appeal.  See Bradburn, 2005 WL 1819969, at *4 quoting In re

Microsoft, 274 F. Supp. 2d 741, 743 (D. Md. 2003) (internal quotations omitted) (stating that a

refusal to grant interlocutory appeal "could result in a senseless waste of private and public

resources and an unconscionable delay in the final resolution of these procedings.").  In my view,

it would materially advance the ultimate termination of the litigation to allow the Court of

Appeals to address each of these issues, if it so chooses.  I find these issues to meet the standard

for interlocutory appeals and will certify this Order for interlocutory appeal.

## IV.    Other Issues

Defendants' motion to alter or amend the judgment will be denied as moot.  As a new trial is being granted, plaintiff's motion for attorneys' fees is not ripe for disposition because she has not prevailed.  An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROSALIND RUSS-TOBIAS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA BOARD OF | : | NO. 04-0270 |
| PROBATION AND PAROLE, | : | |
| EDWARD JONES, FRANK | : | |
| MARGERUM, AND MICHAEL MOYER | : | |

ORDER

AND NOW, this 2nd day of March 2006, upon consideration of defendants' motion for judgment as a matter of law or, in the alternative, motion for a new trial or, in the alternative, motion to alter or amend the judgment, plaintiff's response, defendants' reply, and plaintiff's surreply thereto, as well as plaintiff's motion for attorneys' fees, defendants' response, plaintiff's reply, and defendants' surreply thereto, and for the reasons set forth in the accompanying memorandum it is ORDERED as follows:

1.    Defendants' motion for judgment as a matter of law with respect to plaintiff's Section 1981 discrimination and retaliation claims against all defendants is GRANTED because Section 1981 does not provide an independent cause of action;

2.    Defendant Moyer's motion for judgment as a matter of law is GRANTED on the additional ground that there is insufficient evidence for a reasonable jury to conclude that Moyer took any adverse action against plaintiff;

3.    Final judgment pursuant to Federal Rule of Civil Procedure 54(b) is entered in favor of all defendants, the Pennsylvania Board of Probation and Parole, Jones, and Moyer with respect to plaintiff's Section 1981 claims;

4.      Defendants' motion for judgment as a matter of law with respect to plaintiff's Title VII and PHRA discrimination claims against the Pennsylvania Board of Probation and Parole is DENIED;

5.      Defendants' motion for a new trial with respect to plaintiff's Title VII and PHRA discrimination claims against the Pennsylvania Board of Probation and Parole is GRANTED;

6.      This Order is CERTIFIED for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because Paragraphs 4, 5 & 6 involve controlling questions of law as to which there is substantial ground for difference of opinion and an immediate appeal from this Order may materially advance the ultimate termination of the litigation;

7.      Defendants' motion to alter or amend the judgment is DENIED as moot;

8.      Plaintiff's motion for attorneys' fees is DENIED.


                                        s/ Thomas N. O'Neill, Jr.
                                        THOMAS N. O'NEILL, JR., J.